Good morning. Hang on, just one. Sure. Ms. Traum? Good morning. My name is Anne Traum. I'm appearing on behalf of Kevin Hauser. I'd like to reserve two minutes for rebuttal, and I'll try to keep my eye on the clock. My client, Kevin Hauser, claims that his guilty plea was involuntary. The amount of time that this Court has set aside for this argument today, 20 minutes, is the same amount of time that my client had to review the final version of the written guilty plea in his case. In that 20 minutes, he was under extreme pressure. He was 17 at the time, 16 at the time that he committed the offense. He was immature, scared to death, literally, because he believed that he was choosing between life and death at that moment. And this fear was reinforced by his own attorneys. Under this pressure, he asked for more time, at which time his attorneys simply turned up the pressure. They told him that 400 jurors had to be called that day to cancel the trial, and that the victim didn't have time to decide his own fate between life and death. And he seriously misunderstood the penalty that he was facing under the plea agreement should he choose that route. Looking at the substance of the guilty plea agreement and the canvas that followed, the very brief canvas, we learned many things. One is that the lawyer said that he reviewed the plea agreement with my client during that 20 minutes, line by line, over what he called an extended period of time. Yesterday, I read the guilty plea agreement and the amended information line by line. It took me 12 minutes. That's without any time for questions, any time for explanation of the charges. And there was a new charge in this amended information that he had never seen before, which was the kidnapping charge. That wasn't the focus of the charge. Obviously, the murder was the most important. But that alone was something new that he had never seen before. Although the guilty plea contains a rights waiver, a waiver of the sort of three big rights that they talk about in Boykin, those rights are not reviewed in the canvas. And the guilty plea does not explain the minimum amount of time that my client had to serve before he would be parole eligible, which was really his fundamental one of his fundamental misunderstandings about the penalty, the consequences of this plea. And perhaps most importantly, neither the guilty plea nor the canvas that followed contained a factual basis for the plea other than the charges as they were set forth in the amended information, which is what the Court restated at the hearing. There's no explanation of what the State was required to prove to prove that my client was guilty of those charges. There's no explanation on the record by the lawyer saying that he actually did this, or in the guilty plea, or in the canvas that he said he explained the law as it relates to my client's conduct. And this is key because on the murder charge alone, he was – there were three theories. The Court really canvassed him on the premeditation theory. But the evidence from the preliminary hearing strongly suggests that my client shot a dead body. So premeditated murder as the actual killer was unlikely to be a theory that could convict him. The other two theories, aiding and abetting a first-degree premeditated murder or conspiracy to commit premeditated murder. Wasn't there evidence somewhere in the record of this case that before your client shot the victim that he said he's still alive? Yes. That comes from the preliminary hearing. And there's the two witnesses that testify to the preliminary hearing are the one eyewitness, Brad Colson is his name, who's also a 16-year-old kid who's there witnessing the crime, and the coroner. Brad Colson says that my client said he's still alive, he's still alive. This was after that same witness testified that Devin Rivera, the co-defendant in this case, pumped the victim with nine or ten or more gunshots. Then complementing that, you have the testimony from the coroner who says he can't confirm that the gunshots went in before the shotgun shots, the other kind of shots. Would he have been dead? And he says, yes, he would have. So he also confirmed that... Didn't he say he would be dead very shortly? He would be dead very shortly. Right. It's not clear exactly how much time passed. But that he could be moaning for up to, even after he was dead, he could be, meaning   And there's evidence that he made sounds that would indicate to somebody who didn't know this fact that he might be still alive, and that my client is, you know, and the evidence is clear that my client is a person who shoots second. So it's possible that he, I mean, that evidence strongly suggests that he was not the actual person who fatally wounded this person, but someone who shot into a dead body. Now, that doesn't rule out that he might be guilty on these other theories of vicarious and accomplice liability. We recognize that. But at the same time, those theories of vicarious and accomplice liability are not so easy to grasp and not so easy to prove. And there's no evidence in the record that this minor understood what those theories were. And when you go through the transcript of the guilty plea hearing, the judge first focuses really on the premeditation theory. And then the DA only adds after that, oh, and by the way, Judge, can you say something about aiding and abetting and conspiracy, because indicating that's really what we're getting Hauser on, and you haven't said any, you haven't really covered that in your canvas. And to say that that little exchange is equal to understanding the nature of those charges as it relates to my client's conduct, I think, would be sort of a perverse application of Boykin. I want to turn to sort of why I think the Nevada Supreme Court's resolution of this case is so wrong. I think there's two avenues to pursue here. One is that the Nevada Supreme Court reviews this, takes into account the fact that he had so little time, that he was 17, that he was under this extreme pressure. And it reviews it under its case called Bryant, which is a State case. Now, Bryant does cite to some cases that talk about Boykin. But in my view, Bryant is not a constitutional case that applies Boykin, the constitutional rule in Boykin, because under Bryant, you can review the entire record, not just the canvas. It also says that you can just say what the elements of the offense are or have an admission of the crime committed on the record. That may be adequate, but I don't think that's what happened here. So I think that even if you equate Bryant to the constitutional rule, you sort of don't get the full distance that they actually applied that constitutional rule in this case. And again, I think that Bryant is not consistent with Boykin. The other way to view this case is probably more simple, which is to say that this is simply contrary to an unreasonable application of Boykin. I don't think that any – I think any court that concludes on the basis of this record that this child understood the rights waiver, the true nature of the charges as applied to his conduct, and really understood the penalty that he was signing up for by agreeing to this – to this plea, I think that any court that decides that that was all voluntary under Boykin is – that's objectively unreasonable. We have here the convergence, really, of Boykin, which is the main rule, but also aided by Haley and now Roper, but Haley was in effect at the time, which is that when you are dealing with a juvenile defendant who faces these deficits of an ability to act under pressure, of an ability to understand the consequences of their action, and to process in that situation, they don't process the same as an adult, when you have that kind of person with a diminished capacity, the solicitude of the court that they talk about in Boykin goes up. The court has to be more on guard that this person actually understands what it is that they're doing, and that did not happen here. I'll reserve the balance of my time. Roberts. Thank you, counsel. We'll now hear from the State. Mr. Neidert. Neidert, excuse me. If it pleases the Court, my name is Dave Neidert. I'm the Deputy Attorney General representing the respondents in this case. The simple – I'd like to start by saying I'm thankful that I'm not here defending this kind of Rule 11 of the Federal Rules of Criminal Procedure, because if this was a Rule 11 case, I don't think we'd even be here. Instead, what we are here under is under the habeas corpus statute and under the analysis of whether the Nevada Supreme Court was objectively unreasonable in its determination not once but twice that this particular defendant knowingly, voluntarily, and intelligently pleaded guilty to first-degree murder and kidnapping in front of a Nevada State court. Now, the canvas itself, as I said, if this was a Rule 11 case, it certainly would be inadequate under those circumstances. But if you look at the totality of the record, including the guilty plea agreement, including the canvas, short as it was from the court, it does meet the Boykin standard. The record is pretty clear that while this was a relatively young defendant, he was 17 years old at the time, and while his attorney at the evidentiary hearing said he seemed rather unsophisticated, the record is also clear this was not his first time that he was in the criminal justice system. He had already pleaded guilty in another case. Additionally, his attorney, Mr. Christensen, testified on the motion to withdraw the guilty plea that this had been a case that they thought should be pled from the beginning. Now, Ms. Traum spent some time saying, well, it took me 12 minutes to read the guilty plea agreement. The problem with that, Your Honor, is that while there was a total of 20 minutes to discuss this, the guilty plea agreement is that, first of all, there is the testimony that was accepted that was gone over line by line, that Mr. Hauser had the opportunity to discuss the case not only with his attorney but with his mother, and that he had gone over a similar right previously. The guilty plea agreement is a formed document in the sense that the waiver of rights are listed in the same order. So it wasn't like the day that Mr. Hauser signed his guilty plea agreement was the first time he'd seen that particular piece of paper. It was the first time he'd seen page 2, which talked about the actual crime and the He'd seen it at least obviously once before when he'd signed the other plea agreement. What evidence for, let me rephrase the question, other than Mr. Hauser's age, is there any other evidence of disability, impairment, et cetera, in the record? I'm not aware of any. I think Ms. Traum wants to make his age a big factor, but I'm not aware of any other factors other than his own attorney saying that he seemed relatively unsophisticated. But I think being relatively unsophisticated might be common of criminal defendants of various ages. There's no IQ test or examination or anything like that? No, I don't believe there ever was a challenge to his competency to assist his attorneys or anything of that nature. There's currently some claim that his IQ is about that of a 10-year-old. I'm not aware of that being supported anywhere in the record. And it was certainly not something that was developed at the evidentiary hearing. That's already occurred on this case. And that's the thing. He had an evidentiary hearing. After he entered his plea, the court said, well, let's, you know, they appointed new counsel, and the new counsel prosecuted a motion to withdraw a guilty plea. They had a hearing in the state court. These issues could have been developed in the state court, and they weren't. And now there's a desire to, well, let's litigate it again. Let's ignore whatever happened in the state court and see if we can develop the record further. And that's, quite frankly, not what I believe the purpose of the federal habeas statute is, particularly when there is an opportunity. And that's what the Supreme Court told us in Williams v. Taylor, that you have to develop the facts in the state court in the first instance. Only if the state prevents you from developing the facts are you entitled to try to develop the facts later on. So the issue as to his level of sophistication, beyond what Mr. Christensen testified to, is something that could have been developed in the state court and was not. Basically, Ms. Traum made a rather emotional argument, I believe, with respect to this particular defendant. He was relatively young. He was facing very serious charges. But the reality is what we're here today in the federal habeas corpus context is that the Nevada Supreme Court, as I said earlier, had the opportunity to review this case not once but twice. Because he challenged it not only on direct appeal but also in a post-conviction posture. And twice it made determinations that Mr. Hauser freely, voluntarily, and intelligently entered his plea. That is a decision that this court must review with a deferential standard of whether it was objectively unreasonable. And I believe if you look at the record from the Nevada courts, he has not met this burden. So unless there are any questions, I would submit it, Your Honors, and ask this court to affirm the ruling of the district court. Thank you for your argument. Rebuttal, Ms. Traum. Yes. Thank you. I want to go back to this issue. But we did raise the issue that he did have a low IQ. And I think that this turns on two things. One, his post-conviction process or lack thereof, but also the unique process in which these issues came up in the motion to withdraw a guilty plea. On page 253 of the record, which is in his post-conviction petition, he says, during the psychological examination at Dr. Colasimo's office, a, quote, Jane Doe psychiatrist informed your petitioner that he had the mental capacity of a 10-year-old. There is a psychological evaluation in the file. When was that done? When was that psychological evaluation done? It's actually not. From my recollection, I just looked at it, it's not dated, but it's from the trial attorney's file. So I think it existed possibly shortly before trial because he never had counsel after that. It seems unlikely that it would have happened after that. And our office didn't do it. But when his counsel at that motion to withdraw a guilty plea is appointed and they have an evidentiary hearing on that issue, there's no suggestion in the record that he had access to the client's, I mean, to the client's attorney file. It's not an ineffective assistance kind of development outside the record where the whole file gets turned over to someone else. So that kind of evidentiary hearing, that kind of fact development has never occurred. And in post-conviction, he doesn't get a lawyer, he doesn't get a hearing. This is all sort of done outside of the record. In fact, the district court said, I'm not going to consider this, and the Supreme Court said, yes, you should have considered this, but the low IQ doesn't make a difference to us. I don't think that that fact finding can be deemed reasonable under any circumstances, and we would like an evidentiary hearing to develop these kind of facts because they were not the kind of facts that could have been developed, even with the diligence that was allowed at that hearing that they had on the motion to withdraw a guilty plea, because of the unique way that this comes up in the process. Are you saying that he did not have a lawyer at that point in the motion to withdraw? He did have a lawyer at the motion to withdraw his guilty plea. His lawyer was appointed specifically to conduct that hearing. But there's no evidence in the record that when the lawyer conducts that hearing, that it's sort of akin to an ineffective assistance of counsel type of claim, because he doesn't get the attorney file. He doesn't necessarily get the psychological evaluation that would be in that attorney file to know what this person, that this person has a low IQ. And he may or may not have been able to judge that by himself. Plus, my client has no opportunity to develop evidence attacking either his trial attorney before that motion to withdraw his guilty plea or his trial attorney at that motion to withdraw a guilty plea to bring in this evidence that he has a low IQ. And so not only does he have a diminished capacity because of his juvenile status, but he has one because he really doesn't track what's going on because he has a low IQ. Why didn't the lawyer have access or demand the file from the other lawyer? I don't have evidence of what that process was, but it's my understanding that when someone's appointed in that capacity, it's not they don't have access to the entire file. Now, whether a request was made, I haven't been able to divine that from the file that I have. I think he just gets appointed an attorney to actually conduct that cross-examination, if you will, and examination that happens at that very limited hearing. But in terms of a Williams v. Taylor collateral type of evidentiary development stage, that never occurred in this case. Thank you. Thank both sides for their argument. The case just argued will be submitted for decision, and we'll proceed to the next case on the calendar, which is Coppett v. Korinsky, if counsel are present. If they'd come forward, please.
judges: Lay, B. Fletcher, Hawkins